NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| VALENTIN CEDENO, | |
| Petitioner, | |
| v. | Civil Action No. 09-6395 (GEB) |
| UNITED STATES OF AMERICA, | **MEMORANDUM OPINION** |
| Respondent. | |

**BROWN, Chief Judge**

This matter comes before the Court upon the motion of pro se Petitioner Valentin Cedeno ("Petitioner") to Vacate, Set Aside, or Correct his sentence pursuant to 28 U.S.C. § 2255 (Doc. No. 3.)[1] The Government opposes the motion. The Court has reviewed the parties' submissions and decided the motion without oral argument pursuant to Federal Rule of Procedure 78. For the reasons that follow, Petitioner's motion is denied.

I.   BACKGROUND

This matter arises out of an interstate jewelry store robbery spree. In this motion, Petitioner asserts that his attorney was "constitutionally deficient" in that he failed to "challenge the indictment on double jeopardy grounds," and because he advised Petitioner to "plead guilty to an offense for which he had already been convicted and sentenced." (Petr's Am. Br. at 4-5; Doc.

---

[1] Petitioner's Motion is an amendment to his original § 2255 Motion to Vacate, Set Aside, or Correct ("§ 2255 Motion") (Doc. No. 1.)

No. 3.)  Petitioner argues that these issues should have been raised during the criminal proceedings because an Indictment against him in the District of New Jersey and another Indictment against him in the Southern District of Florida both alleged crimes that were part of the same conspiracy.

Turning to bases of the New Jersey Indictment, from July 2003 through September 2005, Petitioner was one of at least ten members of a group who conspired to commit "smash and grab" jewelry store robberies in New Jersey, Pennsylvania, Georgia, and Florida.  (Pre-sentence Investigation Report ("PSR") ¶ 30; Doc. No. 7-1.)  During these robberies, "multiple masked or disguised defendants stormed into the jewelry store armed with sledgehammers, smashed the display cases with those sledgehammers, loaded sacks with expensive watches or other jewelry, and fled the store to a waiting getaway car."  (Id. at ¶ 31.)  Petitioner was one of the participants who smashed the display cases and loaded the sacks with the jewelry and other items.  (Id. at ¶ 32.)

On July 11, 2008, a Federal Grand Jury in the District of New Jersey returned a ten count Superseding Indictment, Criminal No. 08-192 (GEB), charging Petitioner and seven of his confederates with conspiracy to commit seven Hobbs Acts robberies and related crimes.  (Superseding Indictment, Crim. No. 08-192 ("New Jersey Indictment"); Doc. No. 7-5.)  Petitioner was personally charged with one count of Hobbs Act robbery conspiracy, two counts of robbery, and one count of receipt of stolen property.  (Id. at 7, 14-16.)  Petitioner pled guilty to the first count of the Superseding Indictment, relating to conspiracy, and this Court sentenced him to fifty seven months in prison on January 5, 2009.  (Judgment; Doc. No. 7-6.)

Turning next to the bases underlying the Florida Indictment, Petitioner was involved in a

robbery of a jewelry store in Boca Raton, Florida, along with some of the same conspirators as those stated in the New Jersey Indictment. (PSR ¶¶ 50-57.) He was indicted for that offense by the Southern District of Florida. (Doc. No. 7-8). Petitioner pled guilty to conspiracy to commit that robbery, and to the robbery itself, and was sentenced to fifty one months in prison for that offense. (PSR at ¶¶ 131-138.)

Petitioner filed the instant motion on December 21, 2009 (Doc No. 1), and an amended motion on February 9, 2010 (Doc. No. 3). This Court ordered the United States to answer, and the United States filed its answer and opposition on April 16, 2010. (Doc. No. 7.) Petitioner filed a reply on May 21, 2010. (Doc. No. 8.)

## II.   DISCUSSION

### A.   Standard of Review

Section 2255 of United States Code Title 28 permits a court to vacate, correct, or set aside a sentence that was "imposed in violation of the Constitution or laws of the United States, or that the Court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Generally, Section 2255 "may not be employed to re-litigate questions which were raised and considered on direct appeal.'" United States v. DeRewal, 10 F.3d 100, 105 n.4 (3d Cir. 1993) (quoting Barton v. United States, 791 F.2d 265, 267 (2d Cir. 1986)), cert. denied, 511 U.S. 1033 (1994). However, the Court of Appeals has expressed a strong preference that an ineffective assistance of counsel claim be brought before the district court in the first instance in a motion under 28 U.S.C. § 2255. See DeRewal, 10 F.3d at 103 (citing United States v. Rieger, 942 F.2d

230, 235 (3d Cir. 1991)).  Since it is appropriate to raise a claim of ineffective assistance of counsel under Section 2255, rather than on direct appeal, "the failure to raise such a claim on direct appeal should not be treated as a procedural fault."  Id.

### B. Ineffective Assistance of Counsel

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court defined a two-prong test to establish ineffective assistance of counsel.  The first prong of the test requires that a petitioner show that his counsel's performance was deficient.  Strickland, 466 U.S. at 687.  Specifically, in order to succeed on the deficiency prong, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  This requires that the Court examine the entire proceedings and determine "whether, in light of all the circumstances, the [conduct of Petitioner's trial counsel was] outside the wide range of professionally competent assistance."  Id. at 690.  See also Kimmelman v. Morrison, 477 U.S. 365, 386 (1986).  Accordingly, this Court's inquiry is highly deferential.  Strickland, 466 U.S. at 689.  The Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [Petitioner] must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

Once the deficiency prong is established, Petitioner must then show that as a result of the deficient performance, he was ultimately prejudiced.  Strickland, 466 U.S. at 687.  This prong of the test requires that Petitioner show that "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in that outcome. Strickland, 466 U.S. at 699. Thus, Petitioner must show "that counsel's errors were so serious as to deprive [Petitioner] of a fair [hearing]...whose result is reliable." Lockhart, 506 U.S. at 369 (internal quotes and citation omitted). The focus is on whether the result of the proceeding is fundamentally unfair or unreliable. Id.

### C.  Analysis

The Government argues that the Court should deny Petitioner's motion because he signed a plea agreement, in which he waived his right to collaterally attack his sentence. (Govt's Opp. Br. at 3; Doc. No. 7.) Waivers of a right to appeal or collaterally attack a sentence are generally valid when entered into knowingly and voluntarily unless enforcing such a waiver would result in a "miscarriage of justice." See United States v. Khattak, 273 F.3d 557, 558 (3d Cir. 2001) (upholding the validity of a knowing and voluntary waiver of one's right to appeal provided that it did not result in a miscarriage of justice); United States v. Perry, 142 Fed. Appx. 610, 611 (3d Cir. Aug. 8, 2005) (noting that collateral attack waivers are also valid if they meet the Khattak test). Enforcement of Petitioner's waiver is thus dependant on whether it was made knowingly and voluntarily and even then, only if its enforcement would not result in a miscarriage of justice. See generally United States v. Mabry, 536 F.3d 231, 243 (3d Cir. 2008) (instructing that "a district court has an independent obligation to conduct an evaluation of the validity of a collateral waiver").

Petitioner argues that he did not knowingly, intelligently, or voluntarily enter into his plea

agreement but does nothing but offer this conclusory assertion without meaningfully substantiating it.  (Petr's Am. Br.  at 5; Doc. No. 1.)  The plea agreement, which Petitioner signed, states:

> [Petitioner] knows that he has and . . . voluntarily waives, the right to file any appeal, any collateral attack, or any other writ or motion, including but not limited to an appeal under 18 U.S.C. § 3742 or a motion under 28 U.S.C. § 2255, which challenges the sentence imposed by the sentencing court if that sentence falls within or below the Guidelines offense level of 24.

(Plea Agreement, Sept. 25, 2008 ("Plea Agreement") at 7; Doc. No. 7-9.)  In light of this clear unambiguous language, this Court concludes that Petitioner did indeed knowingly and voluntarily waive his right to appeal or collaterally attack his sentence and no reasonable fact finder could find otherwise.  See, e.g., Khattak, 273 F.3d at 563 (finding that the defendant waived his right to appeal knowingly and voluntarily where the sentencing judge inquired as to whether the defendant understood his rights and defendant received a sentence within the terms of his plea agreement); Richardson v. United States, No. 07-5593, 2008 U.S. Dist. LEXIS 71124, at *3 (D.N.J. Sept. 4, 2008) (finding that petitioner waived his right to collaterally attack his sentence knowingly and voluntarily where the agreement that he signed and his statements at the plea hearing indicated that his waiver was knowing and voluntary, and he received a sentence within the terms of his plea agreement).

      The Court must next inquire as to whether enforcement of the waiver would result in a miscarriage of justice.  Given the Court's finding that Petitioner's waiver was knowing and voluntary, the Court will examine the merits of Petitioner's claims in order to avoid a "miscarriage of justice." Khattak, 273 F.3d at 563.  In Khattak, the Third Circuit cited with approval the factors set forth in United States v. Teeter, 257 F.3d 14 (1st Cir. 2001).  These

"miscarriage of justice" factors include: (1) "the clarity of the error, its gravity, its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum)"; (2) "the impact of the error on the defendant"; (3) "the impact of correcting the error on the government"; and (4) "the extent to which the defendant acquiesced in the result." Khattak, 273 F.3d at 563 (citing Teeter, 257 F.3d at 26) (internal quotes omitted).  Specifically, the Third Circuit has instructed that "enforcing a collateral attack waiver where constitutionally deficient lawyering prevented [petitioner] from understanding his plea or from filing a direct appeal as permitted by his plea agreement would result in a miscarriage of justice." United States v. Shedrick, 493 F.3d 292, 298 (3d Cir. 2007).  Under this authority, claims of ineffective assistance of counsel can rise to the level of a miscarriage of justice, thereby overriding an otherwise valid waiver.

Here, Petitioner argues that defense counsel "provided deficient performance by failing to challenge the indictment on double jeopardy grounds." (Petr's Am. Br. at 4; Doc. No. 3.) Petitioner also claims that his counsel was deficient in that counsel advised Petitioner to plead guilty to the second indictment.  (Id. 4-5.)  The Court concludes that Petitioner has not established a colorable claim of double jeopardy, and therefore his argument must fail.

A petitioner moving to dismiss an indictment on double jeopardy grounds has the burden of going forward with the evidence by putting his double jeopardy claim in issue. See United States v. Felton, 753 F.2d 276, 278 (3d Cir. 1985).  A petitioner must make a non-frivolous showing of double jeopardy to receive a pre-trial evidentiary hearing to determine the merits of his claim.  See United States v. Inmon, 594 F.2d 352, 353 (3d Cir.), cert. denied, 444 U.S. 859 (1979).  One interest a petitioner has in the double jeopardy analysis is that he not be indicted twice for the same offense.  A determination of whether or not a petitioner has been indicted twice

for the same offense considers the "same evidence" test.  See United States v. Young, 503 F.2d 1072, 1075 (3d Cir.1974).  This test examines whether "'the evidence required to support a conviction upon one of [the indictments] would have been sufficient to warrant a conviction upon the other.'"  Id. (citing United States v. Pacelli, 470 F.2d 67, 72 (2d Cir. 1972), cert. denied, 410 U.S. 983 (1973)).

In a conspiracy case, the question is slightly more complicated, and requires a four-prong test.  A petitioner can make out a non-frivolous showing of double jeopardy in a conspiracy case if he can show:

> (a) the "locus criminis" of the two alleged conspiracies is the same . . . (b) there is a significant degree of temporal overlap between the two conspiracies charged . . . (c) there is an overlap of personnel between the two conspiracies (including unindicted as well as indicted coconspirators . . . and (d) the overt acts charged and the role played by the defendant according to the two indictments are similar.

United States v. Liotard, 817 F.2d 1074, 1078 (3d Cir. 1987).  The "ultimate end" of this inquiry, however, is to determine "whether there are two agreements or only one."  United States v. Smith, 82 F.3d 1261, 1267 (3d Cir. 1996).  To this end, the Liotard factors are not applied "in a rigid manner, as different conspiracies may warrant emphasizing different factors."  Id.   The Court considers each factor in turn, keeping in mind the ultimate end of the inquiry.

The first Liotard factor considers the "locus criminis" of the alleged conspiracies, and in this case counsels against the Petitioner's argument.  The two alleged conspiracies differed in scope.  The New Jersey Indictment involved a conspiracy that spanned New Jersey, Pennsylvania, Georgia, and Florida.  (New Jersey Indictment 1-4; Doc. No. 7-5.)  The only offense alleged to occur in Florida was at the Mayors Jewelers in Sanford, Florida.  (Id. at 3.)  The Florida Indictment, meanwhile, only alleged a single robbery of the Mayors Jewelers in Boca Raton,

Florida. (Florida Indictment at 2; Doc. No. 7-8.) This degree of a difference in scope is indicative of separate offenses. See United States v. Becker, 892 F.2d 265, 268 (3d Cir. 1989) (noting that "[t]he Pennsylvania conspiracy, on the other hand, was much broader. It covered a locus of several states, but not West Virginia.")

The second Liotard factor involves the degree of temporal overlap between the alleged conspiracies. A finding of overlap, however, does not instantly signal a single conspiracy. See Becker, 892 F.2d at 268 (stating that "[j]ust because the time periods of the two conspiracies overlapped does not indicate that only one conspiracy existed"); see also United States v. Daniels, 857 F.2d 1392 (10th Cir. 1988) (finding separate offenses even when second conspiracy was completely subsumed in time by first conspiracy). The New Jersey Indictment addressed an offense lasting from July 2003 until September 2005. (New Jersey Indictment at 4; Doc. No. 7-5). The Florida Indictment, meanwhile, covered only April 15, 2005 until April 19, 2005. (Florida Indictment 2; Doc. No. 7-8.) The Third Circuit previously found this sort of overlap unpersuasive in a claim for double jeopardy. See Becker, 892 F.2d at 268 (noting that "the Pennsylvania indictment alleged a time span from 'in or about 1981' to November 13, 1987 whereas the West Virginia indictment covered the limited period from approximately the Spring of 1981 until July 27, 1981," and finding no double jeopardy bar). This Court reaches the same conclusion here.

The third Liotard factor considers the degree of overlap in personnel. As with the second factor, overlap does not automatically signal a single conspiracy. Becker, 892 F.2d at 268. In this case, both conspiracies involved Angel Concepcion, William Valentin, Jonathan Alvarado, and Petitioner. (PSR ¶¶ 30, 57; Doc. No. 7-1.) The New Jersey Indictment also involved four other conspirators not present in the Florida Indictment. (Id.) The Third Circuit has noted that

where circumstances indicate a likelihood that a petitioner would involve an overlapping group of personnel in all of their dealings, the overlap in personnel factor is not automatically indicative of a single conspiracy. See Becker, 892 F.2d at 268 (stating that "[b]ecause Becker's family was involved in his activities, it is not surprising that he would involve them in all his dealings, not just in some.") In this case, at least three of the overlapping personnel, including Petitioner, were residents of Newark, New Jersey. (New Jersey Indictment at 1, Doc. No. 7-5.) It also appears that the overlapping personnel were previously acquainted, even friendly. (PSR ¶ 55; Doc. No. 7-1.) The Court concludes that here, a group of people from the same location and familiar with each other were involved in multiple conspiracies together, like the parties in Becker.

The fourth Liotard factor considers the similarity of the overt acts charged, and the petitioner's role in those acts. The substantive crime of robbery was the same in both indictments, as was Petitioner's role. However, the mere fact that the crimes were of the same type does not instantly afford the Petitioner a double jeopardy argument. See Becker, 892 F.2d at 269 (stating that "the guarantee against double jeopardy does not insulate a criminal for subsequent offenses merely because he chooses to continue committing the same type of crime") (citing United States v. West, 670 F.2d 675, 681 (7th Cir. 1982)).

The only Liotard factor weighing in Petitioner's favor with any substance is the fourth factor. The Court notes again, however, that the Liotard test is not a rigid test, and that different factors may affect difference cases. Smith, 82 F.3d at 1267. The primary inquiry remains whether there are two agreements or only one. Here, it is the different scope of the two conspiracies, both in time and in location, that is especially telling. The Florida Indictment concerned only an agreement to rob a single store, with the conspiracy lasting only four days. The New Jersey

indictment, meanwhile, targeted a much broader, longer, and more involved scheme. Moreover, the overt act charged in the Florida Indictment involved only a Jewelry Store in Boca Raton, which was not present at all in the New Jersey Indictment.

Finally, there was no mutual dependence between these two crimes: one could fail, while the other continued. See Becker, 892 F.2d at 269 (noting that whether two conspiracies depend on each other is part of double jeopardy analysis); see also West, 670 F.2d at 681 (stating that "a reviewing court must look to . . . whether the two conspiracies depend on each other for success") (citing United States v. Castro, 629 F.2d 456, 461 (7th Cir. 1980)). In this case, multiple perpetrators of the Florida Indictment robbery were apprehended on or near the scene, and all of the stolen merchandise was recovered. (PSR ¶¶ 50-56). That robbery was therefore a failure, while the New Jersey Indictment conspiracy continued. (PSR ¶¶ 50-60.) The two conspiracies were therefore not dependent on one another.

An analysis of the Liotard factors, as well as other factors relevant to conspiracy crimes, reveals that the two indictments charged crimes that were the result of separate agreements. Petitioner has not put forward a colorable claim for double jeopardy, and therefore any claim that counsel was deficient for failing to raise that claim must fail.

### III. CONCLUSION

For the foregoing reasons, the Court denies Petitioner's Motion to Vacate, Correct or Set Aside his sentence pursuant to 28 U.S.C. § 2255. An appropriate form of order accompanies this opinion.

Dated: July 2, 2010

s/ Garrett E. Brown, Jr.
GARRETT E. BROWN, JR., U.S.D.J.
